670 F.2d 1348
 Robert M. SNEED, a/k/a Larry K. Sneed, Appellant,
v.
J. Richard SMITH, Superintendent, McDowell County Prison
Unit 4650; Rufus L. Edmisten, Attorney General of the State
of North Carolina; Amos Reed, Secretary, Department of
Corrections, State of North Carolina, Appellees.
 No. 81-6181.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 13, 1981.
Decided Feb. 11, 1982.
 
 Barry Nakell, Chapel Hill, N.C. (Karen Davidson, Elizabeth Lackey, School of Law, University of North Carolina, Chapel Hill, N.C., on brief), for appellant.
 Richard N. League, Sp. Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen. of North Carolina, Raleigh, N.C., on brief), for appellees.
 Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Robert M. Sneed appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254 in which he challenged his North Carolina conviction of and consecutive sentencing to a total term of twenty years for one count of forgery and one count of uttering a single check in the amount of $188.90. Finding the evidence constitutionally insufficient to convict Sneed of forgery, we reverse the district court's denial of the petition in respect of that conviction. Concluding that the district court erred in rejecting Sneed's claim of ineffective assistance of counsel without conducting an evidentiary hearing, we remand for reconsideration of that claim. In all other respects, we affirm the district court's denial of habeas relief.
 
 
 2
 * In his habeas petition Sneed asserted twenty-one grounds for relief, but only four have been raised in this appeal: (1) that the evidence was insufficient to support his conviction of forgery; (2) that he was denied the effective assistance of counsel; (3) that the warrantless search of Sneed's motel suite violated the fourth amendment; and (4) that his consecutive sentencing to the maximum term of ten years' imprisonment for both forgery and uttering was so disproportionate to the offense that it constituted cruel and unusual punishment.
 
 
 3
 In support of his first claim, Sneed introduced the transcript of his state trial. The prosecution presented four witnesses at that trial. The first, Chris Birdwell, testified that three checkbooks had been stolen in a burglary of his company in Kingsport, Tennessee. He identified as the stolen checkbooks three that had been seized in a search of a motel room occupied by Sneed. Additionally, he identified a check made out to Evelyn C. Martin for $188.90 and signed with his name as a check extracted from one of the checkbooks. He testified that he did not make out that check or sign his name to it.
 
 
 4
 The second witness proffered by the State was James Harrington, the manager of an Ingle's market in Asheville. He testified that he cashed the Birdwell check made to the order of Evelyn C. Martin at the request of a middle-aged couple. He could not, however, identify Sneed as the man in that couple.
 
 
 5
 The State's third witness was Thelma K. Bradley, Sneed's co-defendant, who actually passed the forged check. She testified that she had been hospitalized for chronic depression and severe nervousness and that when under pressure she was "absent-minded about some things." She stated that she and Sneed had come to Asheville in early March 1977 and stayed in a motel with another couple with other people coming and going all the time. Sometime during their stay in Asheville, Sneed took her to a grocery store, gave her a Birdwell check made to the order of Evelyn C. Martin and a temporary driver's license in that name, and told her to cash the check. Accompanied by Sneed and using the driver's license as identification, Bradley cashed the check, and Sneed got the money. She testified that her memory of this incident was a bit hazy because she was scared and had been drinking.
 
 
 6
 Fred W. Hensley, one of the arresting officers, was the concluding prosecution witness. He testified that on March 29, three weeks after the check had been passed, he had a suite of rooms at the Rodeway Inn near Asheville staked out as a result of information he had received and surveillance he had conducted. Hensley observed Gene Black, a man he knew to be involved in gambling, pass the vehicle in which he was sitting and enter the suite of rooms under surveillance. Fearing that they had been spotted by Black, Hensley and two other officers followed Black into the suite of rooms, where they found Sneed, Bradley, Black and four others. Sneed was standing in the center, living room, where two typewriters were found. In one of the bedrooms, Hensley found a suitcase with a bag inside containing the Birdwell checkbooks and a checkwriter.
 
 
 7
 Sneed's attorney presented no evidence on his behalf. This failure to present evidence was the primary basis for Sneed's claim that he was denied the effective assistance of counsel. He alleged in his habeas corpus petition that he asked to be allowed to testify in his own defense. His attorney, however, allegedly became angry and told Sneed that the State had failed to prove its case but that if he took the stand he would cause the case to be lost. Sneed stated that he gave his "reluctant acquiescence" to this decision.
 
 
 8
 Sneed further contended, however, that his attorney failed to call seven witnesses who would have testified in his defense and of whom his attorney had knowledge. This allegation was supported by affidavits from six of the seven witnesses. The seventh witness had died prior to the time that Sneed filed his habeas action, but Sneed described what his testimony allegedly would have been. The story to be distilled from the affidavits and Sneed's assertions was that Sneed could not have been involved in the uttering with which he was charged because his car was being worked on at the time he was supposed to have driven to the Ingle's store with Bradley; that Bradley was under the influence of drugs and alcohol virtually throughout her stay in Asheville; and that Bradley actually acted in concert with a couple named Bishop in uttering the check at Ingle's.
 
 
 9
 All the affiants swore that they told Sneed's attorney of the testimony that they might provide. Sneed's attorney, however, did not attempt to subpoena any of these witnesses until he had a subpoena issued the morning of the trial in order to secure the presence of one of the witnesses at a suppression hearing. The trial judge refused to delay the hearing until the witness could be brought into court, and Sneed's attorney therefore offered no evidence at the suppression hearing.
 
 
 10
 In support of his fourth amendment claim, Sneed presented the transcript of the hearing on his pretrial motion to suppress the evidence obtained in the warrantless search of the suite of rooms in which Sneed was arrested. The sole witness at this hearing was Officer Hensley, who testified that he and other officers were canvassing motels in the Asheville area looking for a group of check forgers who had checked out of their rooms at the Quality Inn Motel just before Hensley attempted to serve a warrant to search those rooms. As the officers pulled into the parking lot of the Rodeway Inn in an unmarked car, they saw also pulling into the lot a car they recognized from their surveillance at the Quality Inn. The car was driven by a gambler known to Hensley, and Hensley testified that he "felt" he had been recognized by the gambler as the latter walked to Room 152.
 
 
 11
 Fearing that the occupants of the room might flee, as they had done at the Quality Inn, or destroy evidence, Hensley and two other officers went to the room, where Hensley opened the door and went in. Inside the suite of rooms, Hensley observed seven people, including Sneed, and there found the suitcase containing the three stolen checkbooks and a checkwriter. On the basis of this testimony, the state trial judge upheld the warrantless search and seizure on the ground "that the information available to Officer Hensley and his fellow officers overwhelmingly indicated the necessity for immediate action on their part to prevent the escape of felons and to obtain the fruits of felony crimes."
 
 
 12
 The district court considered each of Sneed's claims in his habeas petition on a motion for summary judgment and disposed of them in a lengthy memorandum decision.
 
 
 13
 With respect to the claims raised in this appeal, the district court first found that there was substantial evidence of all the elements of the crime of forgery.
 
 
 14
 The court then held that, even accepting as true all Sneed's allegations about his request to testify and the testimony that other defense witnesses might have given, there was insufficient evidence to support a finding that Sneed's attorney had been ineffective. Pointing to the unsavory reputations of several of the witnesses and the association of most of them with Sneed's arrest, the court stated that it was "improbable that petitioner's counsel would have felt comfortable using them." The court therefore concluded that it was entirely appropriate for Sneed's counsel to rely on the weaknesses of the State's case and to attack the dubious credibility of Bradley.
 
 
 15
 Turning to Sneed's fourth amendment claim, the district court found that Sneed could not overcome the bar of Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1975) to collateral review of state court dispositions of search and seizure claims because he had received a full and fair evidentiary hearing in the state court. Moreover, even were collateral review available, the district court found itself in agreement with the state trial judge's assessment that a warrantless search of Sneed's motel suite was justified by the exigency stemming from the reasonable probability that the suspects would flee or destroy the evidence if, as Officer Hensley feared, he had been spotted by one of the people entering the motel suite.
 
 
 16
 Finally, the district court determined that Sneed's consecutive sentencing to terms of imprisonment of ten years apiece for forgery and uttering was not constitutionally infirm as cruel and unusual punishment.
 
 II
 
 17
 We take first Sneed's claim that there was insufficient evidence to convict him of forgery. We agree with the claim. In reviewing the sufficiency of the evidence to support a state criminal conviction on a due process challenge in a federal habeas proceeding "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The essential elements of forgery under N.C.Gen.Stat. § 14-119 are (1) a false writing of the check, (2) an intent to defraud and (3) an apparent capability of the check to defraud. E.g., State v. McAllister, 287 N.C. 178, 188, 214 S.E.2d 75, 83 (1975). Our review of the evidence upon which Sneed was convicted of this crime compels the conclusion that it was insufficient under the test of Jackson v. Virginia to comport with the guarantees of federal due process. Specifically we find it insufficient to convince any rational trier of fact that, beyond a reasonable doubt, Sneed made or wrote the check in issue.[1]
 
 
 18
 The State's proof of forgery against Sneed, viewed in the light most favorable to the prosecution, consisted of Birdwell's testimony that three checkbooks had been stolen from his business; Bradley's testimony that Sneed drove her to an Ingle's market in Asheville, gave her a phony driver's license and a forged check taken from one of Birdwell's checkbooks, and made her utter the check; and Officer Hensley's testimony that Sneed and six other people were present in a suite of rooms in which the stolen Birdwell checkbooks and a checkwriter were found. While this proof constitutionally suffices to show that Sneed uttered a forged check, it does not so suffice to show, either directly or inferentially,[2] that Sneed made the forged check and is, therefore, also guilty of forgery. Accordingly, he is entitled to habeas relief in respect of this conviction.
 
 III
 
 19
 We next address Sneed's claim of ineffective assistance of counsel as it might relate to his conviction for uttering the check. The standard is, of course, whether his attorney acted " 'within the range of competence demanded of attorneys in criminal cases.' " Marzullo v. Maryland, 561 F.2d 540, 543 (4th Cir. 1977) (quoting McMann v. Richardson, 397 U.S. 759, 770-71, 90 S.Ct. 1441, 1448-49, 25 L.Ed.2d 763 (1970)). To meet this standard, an attorney must, at a minimum, "conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself enough time for reflection and preparation for trial." Coles v. Peyton, 389 F.2d 224, 226 (4th Cir. 1968).
 
 
 20
 In his petition, Sneed made specific claims that his attorney (1) failed to subpoena crucial defense witnesses and (2) neglected to prepare a proper defense to the charges against him. In support, he submitted affidavits from six potential witnesses,[3] Forest Beachboard, Danny Lunsford, Pete Cole, Jack Deaver, Gene Black, and Benjamin O'Kelly. Five of them asserted that they disclosed what they knew about the case to Sneed's attorney, but that the attorney did not subpoena them to testify. According to these unrebutted affidavits, these witnesses would have offered evidence tending to show the following:
 
 
 21
 (1) that Sneed was never in possession of any check books or a check writer;
 
 
 22
 (2) that Sneed never gave Mrs. Bradley a check or took her anywhere to cash a check;
 
 
 23
 (3) that Mrs. Bradley left the motel on several occasions with Herman Leroy Bishop (also known by the nickname "Arnold") and Brenda Bishop; and that Mrs. Bradley would return from these trips with a roll of money;
 
 
 24
 (4) that when Sneed questioned Mrs. Bradley about the source of this money, she admitted that the Bishops gave her drugs and encouraged her to cash "hot checks" for them;
 
 
 25
 (5) that on the day of the search, the Bishops left a suitcase at the motel;
 
 
 26
 (6) that the Bishops, and not Sneed, perpetrated the offenses in question;
 
 
 27
 (7) that Sneed's automobile was inoperable at the time that Mrs. Bradley testified Sneed drove her to the store to cash the check;
 
 
 28
 (8) that Mrs. Bradley was a long time acquaintance of the Bishops;[4] and
 
 
 29
 (9) that Cable saw out-of-state checks and a check writer in the trunk of the Bishops' car.
 
 
 30
 The affidavits also asserted ability of the affiants to have testified that Mrs. Bradley frequently was intoxicated or in a "drug stupor"; that she was angry with Sneed because of his association with a Ms. Sandra Laws; and that Mrs. Bradley lost money to Beachboard while gambling.
 
 
 31
 The State's only response to Sneed's claims of ineffective assistance of counsel, as supported by these affidavits, is found in its Answer To Petition And Motion To Dismiss in which the State advanced its own theory of defense counsel's trial strategy and his reasons for not subpoenaing or calling any of the defense witnesses.[5] In this motion, the State suggested to the district court that these witnesses were unsavory characters[6] and that Sneed's counsel chose to rely upon the weakness of the State's case rather than calling witnesses whose testimony may have done more harm than good. Sneed's counsel neither testified nor made affidavit in support of this theory as advanced by the State. The district court, conducting no evidentiary hearing, essentially accepted this theory as its findings, drawn from the motion, unmistakably show.[7]
 
 
 32
 We are, of course, in no better position to make an ultimate determination of Sneed's claim of ineffective assistance of counsel on the meager record upon which the district court rejected it than was the district court. But we are satisfied in reviewing that ruling that the district court could not properly reject Sneed's colorable claim on that record. Too many questions remain open, as brief analysis will show.
 
 
 33
 Implicit in the district court's acceptance of the State's unsupported and merely speculative theory of why defense counsel acted as he did in declining to subpoena or call presumably available witnesses prepared to give important exculpatory testimony is the unstated assumption that a choice was forced between using their testimony or relying on the anticipated weakness of the State's case. But of course no such either/or choice was presented.
 
 
 34
 So far as the record shows, the witnesses could readily have been subpoenaed and made available for calling if the course of trial dictated that strategy, with the decision being reserved pending presentation of the State's case. Had that been done, with the decision being then made not to use these witnesses, a quite different question of deliberate, though possibly unwise, trial strategy as against simple neglect would have been presented to the district court.
 
 
 35
 But, on the record presented, that was not what happened. No subpoenas ever were issued, save for Beachboard, and as to Beachboard, the trial transcript reveals that this subpoena had not been issued until the morning of the trial. When Beachboard was not present at the close of the State's evidence, Sneed's counsel requested that the witness be brought to court to testify. The court declined to delay the hearing in order to compel Beachboard's attendance when it was disclosed that the subpoena had not been issued until earlier that morning. Since it appears that this witness would have been called had he been present or if the trial judge had delayed the trial long enough to have him brought to court, we are not convinced and do not think the district court could properly have determined on the basis of this record, that Sneed's counsel had in fact simply made a considered, though perhaps faulty, strategic decision in advance of trial to call no witnesses.
 
 
 36
 As indicated, we think the record leaves open critical questions which cannot properly be determined against Sneed on the documentary record upon which his claim was rejected.
 
 
 37
 In United States v. Mandello, 426 F.2d 1021 (4th Cir. 1970), we pointed out the inappropriateness of considering a claim of ineffective assistance of counsel on direct appeal without requiring the defendant to proceed initially under 28 U.S.C. § 2255 in any case except those where the trial record conclusively demonstrates that the defendant did not have effective representation. We stressed in that context the importance of counsel's testimony in determining whether the defendant had effective representation. Even in a § 2254 proceeding, it is very difficult to determine whether it "conclusively appears" that a defendant was provided with effective representation in the absence of an adequate evidentiary hearing. Here, the district court made findings of fact drawn directly from the State's motion without holding any evidentiary hearing or determining whether Sneed's attorney would agree or disagree with the State's independent analysis and speculation concerning his mental processes and his trial strategy. It is not known how Sneed's counsel would respond to a charge of ineffective assistance and until it is we think the colorable claim made here by Sneed cannot properly be resolved.
 
 
 38
 On this record, we do not think it is possible for either this court or the district court to determine as a matter of law that Sneed's counsel either did or did not display the range of competence demanded of attorneys in criminal cases. Certainly it cannot be determined as a matter of law that counsel acted from informed professional deliberation when he did not subpoena-much less call-six[8] witnesses whose testimony that someone else committed the crimes with which his client was charged may at least have raised a reasonable doubt of guilt or, at minimum, seriously damaged the already fragile credibility of the State's principal witness, Thelma K. Bradley. In consequence, neither can it be determined as a matter of law on the present record that defense counsel did not commit errors of advocacy and representation so flagrant that they amounted to constitutionally ineffective assistance.
 
 
 39
 For these reasons, we must remand this claim for an evidentiary hearing at which Sneed's counsel will be given an opportunity to testify regarding his trial strategy and his reasons for not subpoenaing or calling witnesses who arguably would have helped his client's cause. Assuming that he does, the district judge can then assess the effectiveness of defense counsel based on that counsel's own representations rather than on the raw surmises of other counsel. If he does not testify, the claim may be otherwise reconsidered in accordance with this opinion.
 
 IV
 
 40
 To have his fourth amendment claim considered in the district court, Sneed, of course, had to overcome the barrier of Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976), by showing that "his opportunity for a full and fair litigation of his Fourth Amendment claim or claims was in some way impaired," Doleman v. Muncy, 579 F.2d 1258, 1265 (4th Cir. 1978). Sneed argues that, while a suppression hearing was held on his fourth amendment claim in the state court, that forum did not provide him with a full and fair opportunity to challenge the warrantless search of his motel suite because Officer Hensley, the only witness at the suppression hearing, testified falsely and because the state trial court did not apply the relevant constitutional standards in good faith.
 
 
 41
 We decline-as did the district court-to conduct the review that Sneed thereby invites. Stone v. Powell, of course, must contemplate that a federal habeas court may make any threshold inquiry needed to satisfy itself that the full and fair opportunity to litigate in state court upon which its rule of deference is predicated has not been impaired. But the ultimate rule of deference would of course be swallowed if impairment in this sense could be shown simply by showing error-whether of fact or law-in the state court proceeding. Sneed's suggestion of perjury is merely a suggestion of factual error; his suggestion of a failure to apply relevant constitutional standards is merely a suggestion of legal error, not made otherwise by his unsupported assertion of a lack of good faith. We do not address the question whether perjury deliberately condoned or clear, dispositive legal principle flagrantly disregarded might ever constitute impairment in this sense. We hold only that Sneed's allegations of impairment are no more than allegations of state court error correctible by normal processes of direct review and hence not properly addressed in this federal habeas proceeding.
 
 V
 
 42
 Sneed's final contention is that his consecutive sentencing to the maximum term of imprisonment of ten years for both forgery and uttering constitutes cruel and unusual punishment. This contention, even if not mooted by our decision voiding the forgery conviction, is now foreclosed by the Supreme Court's intervening decision in Hutto v. Davis, --- U.S. ----, 102 S.Ct. 703, 70 L.Ed.2d ----, (1982).
 
 VI
 
 43
 Having found the evidence constitutionally insufficient to convict Sneed of forgery, we reverse the district court's disposition of that claim and remand for grant of the writ of habeas corpus with respect to Sneed's forgery conviction. Having concluded that Sneed's claim of ineffective assistance of counsel as it pertains to the uttering conviction could not properly be denied on the record before the district court, we vacate that portion of the judgment and remand the claim for reconsideration in accordance with this opinion. In all other respects the judgment of the district court is affirmed.
 
 
 44
 REVERSED AND REMANDED IN PART, AFFIRMED IN PART.
 
 
 
 [1]
 The indictment only charged Sneed with forging the name of the maker, Birdwell; not the name of the payee, Martin. The question is not therefore the sufficiency of the evidence to convict for aiding and abetting forgery of the payee's endorsement. That would be quite a different question
 
 
 [2]
 Following submission of this appeal our attention has been drawn, sua sponte, to several North Carolina decisions suggesting the possible existence in that state of a judicially created general presumption of guilt of forgery from proof alone of possession of a forged instrument coupled with efforts to cash or otherwise use it. See, e.g., State v. Keller, 268 N.C. 522, 151 S.E.2d 56 (1966); State v. Welch, 266 N.C. 291, 145 S.E.2d 902 (1966); State v. DeGina, 42 N.C.App. 156, 256 S.E.2d 275 (1979); State v. Bauguess, 13 N.C.App. 457, 186 S.E.2d 185 (1972); State v. Stevens, 9 N.C.App. 665, 177 S.E.2d 339 (1970)
 Whether such a general presumption-if it does exist-may have been relied upon by the state courts in submitting this case to the jury and upholding the conviction in state collateral review proceedings does not appear. The state jury was not instructed that such a presumption might be used by it to convict and there is no indication of the precise evidence sufficiency test used by the state courts in submitting the case and upholding the conviction.
 We note this possibility only to observe that the constitutional sufficiency of the evidence in this case under the test of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), would not be affected by the existence of such a general presumption, whether of legislative or judicial creation. See United States v. Romano, 382 U.S. 136, 140-44, 86 S.Ct. 279, 281-83, 15 L.Ed.2d 210 (1965); see also Leary v. United States, 395 U.S. 6, 36 n.64, 89 S.Ct. 1532, 1548, n.64, 23 L.Ed.2d 57 (1968); Tot v. United States, 319 U.S. 463, 466-67, 63 S.Ct. 1241, 1244, 87 L.Ed. 1519 (1943).
 Our obligation, under Jackson, is independently to assess the sufficiency of the evidence in this case, without regard to the criterion used by the state courts, and even if it were manifest that they invoked the proper test. Jackson v. Virginia, 443 U.S. at 322 n.15, 99 S.Ct. at 2790 n.15. As indicated, the record does not reveal what test was invoked and whether in the process any such general presumption from possession and attempted use was applied.
 
 
 [3]
 A seventh witness, Ted Cable (Cagle) apparently died at some undisclosed time after March 29, 1977, but the State's voir dire evidence indicated that he was present at the motel on the date of the search
 
 
 [4]
 On cross-examination Mrs. Bradley claimed she had no idea who Brenda and Arnold Bishop were
 
 
 [5]
 The State's motion read in part: "However, it seems improbable that in view of the reputations and associations of these witnesses, counsel would have felt comfortable using them.... Instead, it appears that the most appropriate course counsel could have taken would have been the one he did-to argue the inferences available from the use of a co-defendant who was apparently an immoral person, who did have emotional problems and who was obviously interested in the outcome.... In light of the foregoing, the failure of counsel to call these witnesses ... would have been the result of informed professional deliberation rather than ignorance or neglect."
 
 
 [6]
 This suggestion apparently is based upon the voir dire testimony of a police officer who identified one of the witnesses as a "bar room brawler" and several others as "known gamblers in the Asheville area."
 
 
 [7]
 The district court found, in part: "In view of this, it seems improbable that petitioner's counsel would have felt comfortable using them.... Instead it appears that the most appropriate course counsel could have taken would have been the one he did-to argue the inferences available from the use of a co-defendant who apparently was an immoral person, who had emotional problems, and who obviously was interested in the outcome."
 
 
 [8]
 Perhaps seven witnesses were available at time of trial, depending on the date of Cable's (Cagle's) death